UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————

DAVID ELLIS, Successor Plan )
Administrator and Successor Plan )
Trustee for the Rycenga Homes, Inc. )
Profit-Sharing 401(k) Plan, )
 )
               Plaintiff, )    Case No. 1:04-cv-694
 )
v. )    Honorable Joseph G. Scoville
 )
RYCENGA HOMES, INC., et al., )
 )    **<u>OPINION</u>**
               Defendants. )
_____ )

      This is a civil action brought by the successor trustee of a profit-sharing plan pursuant

to the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001-1461.  The

plan was established by Rycenga Homes, Inc. for the benefit of its employees.  Plaintiff's claims,

brought on behalf of the plan and its participants, arise from improper loans made from plan assets

to Rycenga Homes, under the direction of Ronald J. Retsema, the former trustee of the plan.  All

parties agree that the loans were prohibited transactions under section 406(a)(1) of ERISA, 29 U.S.C.

§ 1106(a)(1).  Default judgments have already been entered against Rycenga Homes, Inc. and

Retsema.  The only remaining defendant is Edward D. Jones & Co., L.P. (Edward Jones), a securities

broker who maintained accounts for the plan from 1984 through 2004.  Plaintiff contends that

Edward Jones was a fiduciary and is liable for Retsema's wrongdoing under the provisions of ERISA

governing fiduciary liability. Alternatively, plaintiff contends that Edward Jones, even if not a fiduciary, is liable under common-law principles.

The time for completion of discovery is expired, and both parties have now moved for summary judgment. Plaintiff's motion (docket # 127) seeks a partial summary judgment concluding that Edward Jones was a fiduciary of the plan and that it is liable either directly or under the co-fiduciary provisions of ERISA. Defendant's motion (docket # 125) raises the following contentions: (1) Edward Jones was not a fiduciary under ERISA; (2) even assuming fiduciary status, Jones did not breach any of its limited fiduciary duties to the plan; (3) plaintiff's claims based on actions occurring before October 18, 1998, are barred under the ERISA statute of limitations, 29 U.S.C. § 1113; and (4) plaintiff's common-law claims are preempted by ERISA or fail to state a claim upon which relief can be granted. The parties have consented to the dispositive jurisdiction of a magistrate judge. (*See* Consents and Orders of Reference, docket #'s 33, 34, 46, 101). The court conducted a hearing on both motions on February 1, 2007. For the reasons set forth below, the court concludes that defendant Edward Jones acted as a plan fiduciary under ERISA as a matter of law. The court further concludes that defendant is entitled to summary judgment on certain theories of ERISA liability, but that genuine issues of material fact preclude a summary judgment for either party on the question whether defendant is liable under two theories of direct liability and under the co-fiduciary section of ERISA and whether the six-year statute of limitations bars any part of plaintiff's claim. Finally, the court concludes that plaintiff's common-law claim in count II is preempted.

**Applicable Standard**

When reviewing cross-motions for summary judgment, the court must assess each motion on its own merits.  *See Federal Ins. Co. v. Hartford Steam Boiler Inspection & Ins. Group*, 415 F.3d 487, 493 (6th Cir. 2005); *Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrevocable Trust*, 410 F.3d 304, 309 (6th Cir. 2005).  "'[T]he filing of cross-motions for summary judgment does not necessarily mean that an award of summary judgment is appropriate.'" *Bowling Irrevocable Trust*, 410 F.3d at 309 (quoting *Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004), *cert. denied*, 125 S. Ct. 2930 (2005)); *see Appoloni v. United States*, 450 F.3d 185, 189 (6th Cir. 2006).

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006); *Briggs v. Potter*, 463 F.3d 507, 511 (6th Cir. 2006).  The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Swiecicki v. Delgado*, 463 F.3d 489, 492 (6th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

When the party without the burden of proof (generally the defendant) seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of

evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e); *see Pack v. Damon Corp.*, 434 F.3d 810, 814 (6th Cir. 2006). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252); *see Kessler v. Visteon Corp.*, 448 F.3d 326, 329 (6th Cir. 2006); *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006). "A nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part on credibility considerations. Instead, the nonmoving party must present evidence to defeat a properly supported motion for summary judgment. The party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or to refute the proof of the moving party in some material portion, and the opposing party may not merely recite the incantation, 'credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Fogerty v. MGM Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004), *cert. denied*, 543 U.S. 1120 (2005).

A moving party with the burden of proof (typically the plaintiff) faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). As shown above, the moving party without the burden of proof needs only show that the opponent cannot sustain his burden at trial. "But where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The United States Court of Appeals for the Sixth Circuit has repeatedly emphasized that the party with the burden of proof faces "a substantially higher hurdle" and "'must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000)); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, a summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

### **Findings of Fact**

1.      Rycenga Homes, Inc. created a 401(k) profit-sharing plan for the benefit of its employees on or about April 1, 1984. (Retsema Dep., 12). Ronald Retsema, the President of the corporation, served as the sole trustee of the plan from 1984 through 2004. (*Id.*, 12-13). It is

undisputed that in 1984, the plan opened an account with Edward Jones by executing a standard retirement trust form and corporate account form. These forms authorized Edward Jones to open an account in the name of the plan and authorized Retsema, as the trustee, to issue instructions to Edward Jones regarding the purchase of securities for the account.[1] No document identifies Edward Jones as a plan fiduciary. At all relevant times, Thomas Baetens, an Investment Representative in the Grand Haven office of Edward Jones, was assigned responsibility for this account. (Retsema Dep., 15-16).

2.    At no time did Edward Jones act as a third-party administrative (TPA) for the plan. During the twenty years that Edward Jones handled the plan's investments, four independent companies acted as TPA. The TPA, and not Edward Jones, was responsible for the administrative aspects of the plan, including preparing plan documents, calculating individual account balances, and issuing annual reports and IRS filings.

3.    The plan's account at Edward Jones had two components -- a securities account and a money market checking account. Both of these accounts were "nondiscretionary," that is, the customer rather than the securities broker had sole discretion to decide which purchases and sales to make. The testimony establishes that all decisions to buy or sell securities on behalf of the

---

[1] Apparently, the records of Edward Jones are incomplete in this regard. Defendant has presented the court with a trust account form (Def. Ex. 2) dated July 23, 1982, which predates the ERISA plan at issue herein and lists Pacesetter Bank & Trust as the sole trustee of a previous thrift and profit-sharing plan. The corporate account form presented to the court (Def. Ex. 3) is dated June 17, 1999, fifteen years after the creation of the plan at issue in this case. Nevertheless, the parties do not dispute Mr. Retsema, as trustee of the plan, opened accounts in 1984 with Edward Jones on behalf of the plan and that the paperwork documenting the creation of these accounts follows the minimalist approach reflected in defendants' Exhibits 2 and 3.

plan were made by the plan trustee and not by Edward Jones, and that Edward Jones had no authority to trade on behalf of the account.

       4.      Contributions from employee paychecks were withheld weekly and were remitted to Edward Jones for investment.  (Retsema Dep., 15).  In addition, the employer made voluntary contributions to the plan periodically, although it was not obliged to do so.  The Rycenga 401(k) plan was a "pooled-asset" plan, meaning that the participants did not have the ability to direct the investment of their individual accounts.  Rather, the plan trustee selected the investments, and each participant had a percentage share of the whole.  (Baetens Dep., 28-29).

       5.      When plan participants retired or otherwise separated from the company, the company notified Baetens, who generally met with employees to discuss roll-over or withdrawal of the employee's funds in the plan.  (Baetens Dep., 30-31).  The TPA, however, handled all other aspects of the separation.

       6.      The record establishes beyond genuine issue that Baetens regularly rendered to the trustee advice concerning the investment of plan assets over the relevant twenty-year period.  When asked in an interrogatory to describe all services provided to the plan, Edward Jones's answer included the following: "From time to time, Tom Baetens, Edward Jones Investment Representative, made investment recommendations to Ronald Retsema, Plan Trustee."  (Response 5 to Plf's First Discovery Requests, Plf. Ex. 2).  Retsema testified he met with Baetens periodically and "he would advise us how to invest."  (Retsema Dep., 15).  Baetens's advice came unsolicited or in response to Retsema's inquiries:

          If we had money that we were accumulating in our cash account, I might call him and he would say "Well, I think you should invest here or there."  If he saw

something, he might call me and say "Well, hey. I think you ought to do this," but generally it was Tom Baetens that advised us.

(Retsema Dep., 15). The advice rendered by Baetens involved strategy as well as individual investments:

> The investment strategy that he discussed was generally when we first started back in 1984. I think at that time we were just about wholly invested in Putnam funds, and he would advise us into which funds to invest in that. And in later years we still had a lot in Putnam funds, but he also advised buying other things from time to time, and all of our purchases were made through Edward D. Jones.

(*Id.*). A typical occasion for Baetens to call was his perception that too much cash was accumulated in the account. (Retsema Dep., 36). Baetens might recommend immediate investment or suggest holding back for a month, because he anticipated a market correction. (*Id.*). Baetens recommended particular Putnam funds, and in later years he recommended buying some bonds. (*Id.*, 37).

7. The testimony of Thomas Baetens was essentially in accord with that of Retsema on this issue. He confirmed that he and Retsema "would sit down periodically to review the assets in the plan and to do the asset allocation. . . ." (Baetens Dep., 64). He testified that the cash contributions and disbursements from the plan accounts would require periodic rebalancing of the portfolio. (Baetens Dep., 47).

> And periodically we would rebalance the portfolio. For instance, based on the economic times where there would be, particularly in the late '80s when we had a big run up in the stock market, it made sense to reallocate some of the assets into the bond market. So some of the trades may be going from Putnam stock fund to Putnam bond fund or Putnam bond fund to Putnam stock funds, so that was more of a rebalancing situation. And obviously a lot of activity was going on in that particular time. So there were several trades done.

(*Id.*, 47-48). Baetens based his advice on general guidelines for retirement funds that Edward Jones generated through the Investment Policy Committee or "IPC." (Baetens Dep., 65). The guidelines addressed the balance of the investment of retirement funds among cash, income and "growth and

income" investments within "wide parameters." (*Id.*).  Baetens would periodically review the plan's

holdings against these guidelines, and make investment recommendations:

> It's reviewed on a quarterly basis and then it's adjusted mainly for the economic
> conditions.  And so periodically we would meet, and may have been twice a year, in
> some cases it may have been after the annual reports came out, to review that, and
> then I would do a printout on this is the asset allocation of the funds and see if we
> should make any rebalancing positions.  And once again this was usually from, say,
> a Putnam stock fund to a bond fund, or a bond fund to a stock fund to try to stay
> within these Edward Jones parameters.  So we would make the recommendations and
> ultimately he was the one who decided what changes were to be made.

(Baetens Dep., 65-66).

8.     The record does not identify any instance in which the plan trustee failed to

accept a recommendation from Edward Jones concerning a plan investment.  (Def. Answers to

Requests for Admissions, 16, 17, Plf. Ex. 8; Retsema Dep., 16-17, 37).

9.     Edward Jones was compensated for its services in a number of ways.  The

principal source of compensation was the receipt of commissions at the time each security was

purchased.  (Baetens Dep., 34, 42).  The firm also charged service fees on a quarterly basis,

calculated on the size of the investment portfolio.  (Baetens Dep., 34; Rule 30(b)(6) Dep., 10-12, Plf.

Ex. 1).  Edward Jones also received revenue-sharing fees and shareholder accounting fees on all

Putnam funds held by the plan.  (Rule 30(b)(6) Dep., 17-22).

10.     Beginning in July of 1992 and continuing through May of 2004, Retsema

made numerous transfers of plan assets to the plan's sponsor, Rycenga Homes, Inc.  Retsema made

each transfer by writing a check on the plan's checking account maintained with defendant Edward

D. Jones.  (*See* Plf. Ex. 14-1).  The checks were made payable to Rycenga Homes, Inc., not to any

plan participant or beneficiary, and they were made out in even amounts, such as $20,000 or

$35,000. (*Id.*).   Rycenga Homes repaid the plan from time to time, in each instance with a check. The memo line of each check contained the words "loan repayment."   The internal monthly cash receipt reports maintained by Edward Jones characterized these receipts as "loan repayments." (*See* Plf. Ex. 17).   As a result of these prohibited transactions, Retsema removed approximately $2,155,000.00 of plan assets.   After all repayments, plaintiff claims a net loss to the plan of $876,905.57, plus interest and lost opportunity costs.

11.    The fact of outstanding loans to a plan sponsor was also discernable from the annual reports provided by the third-party administrators.  For the plan years ending March 31, 1998, 1999, 2000, 2001, 2002, 2003, and 2004, each annual report showed an employer contribution receivable.  The amount receivable grew from approximately $51,000 in 1998 to over $1.1 million in 2004.  Rycenga Homes was not required to make any contributions to the plan, as all employer contributions were discretionary.  Jones has admitted that it was aware of the discretionary nature of the employer's contributions. (Rule 30(b)(6) Dep., 132-39).  Baetens received some of the annual reports, which he used to prepare for his annual meetings with Retsema to discuss asset allocation, but it is unclear whether he received them each year.  (Retsema Dep., 20; Baetens Dep., 109-110; Rule 30(b)(6) Dep., 198).

12.    By at least 2001, the third-party administrator, Tofias, P.C., had become aware of the prohibited distributions.  By letter dated September 10, 2001 (which was the cover letter to the 2001 annual report), Bernard E. Kaplan, an employee of the TPA, "strongly recommended" that the company discontinue borrowing from the plan, advising that the practice may be a prohibited transaction subject to a fifteen percent excise tax and also "may be a criminal offense since it is employee funds that the company is utilizing." (Plf. Ex. 18).  A copy of this letter was produced

from defendant's file.  Mr. Baetens, however, testified that although he reviewed copies of the administrative reports, he had no memory of receiving this letter and that he was distracted at the time by personal and business problems.  (Baetens Dep., 109-110, 119-121).

13. In September 2004, plan participants called Mr Baetens and told him that they suspected Retsema had been using plan assets for the benefit of his business.  (Baetens Dep. 76). Baetens told the participants to contact the Department of Labor, and provided a toll free number to them.  He then called Retsema, who admitted that he was loaning money from the plan to his corporation.  (*Id.*).  Baetens called the St. Louis office of Edward Jones to report the situation.  Greg Reynders, an Edward Jones senior project leader, immediately terminated all check-writing privileges on the account.  (*Id.*, 75-76).

14. This lawsuit followed.  The original suit was brought by fifty former employees of Rycenga Homes.  In November 2005, David Ellis, acting as successor trustee and administrator under the plan, substituted as plaintiff and filed a first amended complaint.  The amended complaint named American Express, one of the former third-party administrators, as an additional defendant.  American Express settled with the plaintiff.  Default judgments have been entered against Retsema and Rycenga Homes.  The case against Edward Jones alone remains pending and is now before the court on cross-motions for summary judgment.

## Discussion

The cross-motions for summary judgment frame the following issues:

(A)    Whether Edward Jones was a fiduciary for purposes of ERISA?

(B)      Whether Edward Jones is liable for the prohibited transactions committed by Retsema, either directly or under ERISA's provisions concerning co-fiduciary liability?

(C)      Whether certain claims are barred by the statute of limitations?

(D)      Whether plaintiff's state-law theory of breach of fiduciary duty is viable?

The court will consider each issue in turn.

### A.      The Status of Edward Jones as a Fiduciary Under ERISA

#### 1.      The Law Governing Fiduciary Status Under ERISA

The ERISA statute contains its own definition of the term "fiduciary."  ERISA provides as follows:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  The definition of a fiduciary under ERISA is a functional one. *See Mertens v. Hewitt Assoc.*, 508 U.S. 248, 262 (1993).  It is intended to be broader than the common-law definition and does not turn on formal designations or labels. *See Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir. 1999).  Further, the test is objective; a person's subjective belief that he is or is not a fiduciary is immaterial. *See Farm King Supply, Inc. Integrated Profit Sharing Plan & Trust v. Edward D. Jones & Co.*, 884 F.2d 288, 292 (7th Cir. 1989).

-12-

Analysis of a statute must begin with a careful examination of its text. The text of the statutory definition of fiduciary in ERISA reveals that a person may be deemed a fiduciary in two general circumstances. The first involves the exercise or possession of discretionary authority or control. Section 3(21)(A)(i) defines a fiduciary as a person who exercises discretionary authority or control respecting management of a plan or *any* control over its assets. *See Briscoe v. Fine*, 444 F.3d 478, 491 (6th Cir. 2006) (any control of plan assets, even absent discretionary authority, is sufficient). Likewise, subsection (iii) deems a person a fiduciary if he "has" discretionary authority or responsibility in the administration of a plan. Clearly, both subsection (i) and (iii) contemplate that the fiduciary exercise, or at least possess, discretionary authority with regard to the plan or control of its assets. Subsection (ii), however, is different. It defines as a fiduciary a person who renders investment advice for a fee or other compensation, direct or indirect, with respect to plan assets or a person who has any authority to do so. Contrary to defendant's argument, fiduciary status under subsection (ii) does not require the exercise of discretionary authority or control. On its face, it requires only that the fiduciary render investment advice for a fee or other compensation, direct or indirect, with respect to plan assets. This definition, without more, would appear to cover any stockbroker who gives investment advice to a plan and is compensated directly or indirectly for that advice.

The ERISA statute, however, is not the only source of law in this area. The Department of Labor, acting pursuant to a statutory grant of authority, has adopted regulations defining when a person is deemed to be providing investment advice for purposes of section 3(21)(A)(ii) of ERISA. These regulations significantly narrow the class of stockbrokers who might otherwise fall within the statutory definition. The court is required to treat the regulation as law so

long as it is reasonably related to the purposes of the enabling legislation.  *Mourning v. Family Pub. Serv., Inc.*, 411 U.S. 356, 369 (1973).  Relevant to the present case, the regulation provides as follows:

> (c)     *Investment advice*.  (1) A person shall be deemed to be rendering "investment advice" to an employee benefit plan, within the meaning of section 3(21)(A)(ii) of the Employee Retirement Income Security Act of 1974 (the Act) and this paragraph, only if:
>
> (i)     Such person renders advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property; and
>
> (ii)     Such person either directly or indirectly (e.g., through or together with any affiliate)--
> (A)     Has discretionary authority or control, whether or not pursuant to agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; or
> (B)     Renders any advice described in paragraph (c)(1)(i) of this section on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

29 C.F.R. § 2510.3-21(c).  On its face, the regulation sets forth two major elements for the finding of a fiduciary under section 3(21)(A)(ii) of ERISA.  The first element is that the person renders advice to the plan as to the value of securities or makes recommendations as to the advisability of investing in, purchasing, or selling securities.  The second element can be satisfied in one of two alternative ways.  First, it is satisfied if the person has discretionary authority with respect to purchasing or selling securities.  The second alternative is that the person renders advice on a regular basis pursuant to a mutual agreement or understanding, whether or not written, that the person's

services will serve as a primary basis for investment decisions with respect to plan assets. The second alternative further requires that the mutual arrangement contemplate that the person will render individualized investment advice based on the particular needs of the plan regarding matters such as investment policies or strategies, overall portfolio composition, or diversification of plan investments.

The regulation's definition of the term "fiduciary," as applied to stockbrokers, therefore includes two classes. The regulation includes stockbrokers who actually have discretionary authority with regard to buying and selling securities, a situation not present in this case. The second alternative, however, does not require that the stockbroker have discretion or control. It merely requires rendering of investment advice pursuant to a mutual agreement that the stockbroker's advice will serve as a primary basis for investment decisions and that the broker will render "individualized investment advice" as defined by the regulation.

The regulation contains a further provision regarding registered brokers and dealers, which defendant mischaracterizes as an "exemption" for stockbrokers. A reading of this section demonstrates that it adds virtually nothing to the general provisions of the regulation concerning investment advice, but merely applies them in a more particular way to registered brokers and dealers. This provision, captioned "Execution of securities transactions," reads as follows:

(1) A person who is a broker or dealer registered under the Securities Exchange Act of 1934, . . . shall not be deemed to be a fiduciary, within the meaning of section 3(21)(A) of the Act, with respect to an employee benefit plan solely because such person executes transactions for the purchase or sale of securities on behalf of such plan in the ordinary course of its business as a broker, dealer, or bank, pursuant to instructions of a fiduciary with respect to such plan, if:

(i) Neither the fiduciary nor any affiliate of such fiduciary is such broker, dealer, or bank; and

(ii)     The instructions specify (A) the security to be purchased or sold, (B) a price range within which such security is to be purchased or sold, or, if such security is issued by an open-end investment company registered under the Investment Company Act of 1940 (15 U.S.C. 80a-1, *et seq.*), a price which is determined in accordance with Rule 22c-1 under the Investment Company Act of 1940 (17 CFR 270.22c-1), (C) a time span during which such security may be purchased or sold (not to exceed five business days), and (D) the minimum or maximum quantity of such security which may be purchased or sold within such price range, or, in the case of a security issued by an open-end investment company registered under the Investment Company Act of 1940, the minimum or maximum quantity of such security which may be purchased or sold, or the value of such security in dollar amount which may be purchased or sold, at the price referred to in paragraph (d)(1)(ii)(B) of this section.

29 C.F.R. § 2510.3-21(d).  This part of the regulation makes it clear that a stockbroker is not a fiduciary "solely" because he executes transactions for the purchase or sale of securities, even if the broker is given some discretion concerning the timing of purchase or sales.  Of course, a stockbroker who "solely" executes transactions by definition gives no investment advice, as that term is defined in subsection (c) of the regulation.  To this extent, the "exemption" provision adds virtually nothing. Its only effect is to make sure that stockbrokers (and others named therein) are not deemed to be fiduciaries merely because of their exercise of the very limited discretion involved in the timing of purchases and sales.

In summary, nothing in either section 3(21)(A)(ii) of ERISA or the implementing regulation necessarily requires a finding that a stockbroker have possessed or exercised discretionary authority over plan assets as a prerequisite to the finding of fiduciary status.  To be sure, possession or exercise of discretion or control will lead to a finding of fiduciary status.  In the absence of discretion or control, however, a stockbroker may clearly be deemed a fiduciary under the alternative test set forth in section 2510.3-21(c)(ii)(B) of the regulation, and no finding of discretionary authority

or control is necessary. Nothing in the "exemption" provision of subsection (d) of the regulation changes this result.

Nevertheless, Edward Jones argues that a finding of discretionary control or responsibility is necessary for any finding of fiduciary status under ERISA. This contention is untenable, and none of the cases cited by defendant, properly interpreted, supports such a result. For example, defendant quotes a sentence from *Maniace v. Commerce Bank*, 40 F.3d 264, 267 (8th Cir. 1994), to the effect that discretion is the "benchmark" for fiduciary status under ERISA. The *Maniace* case, however, did not involve the provisions of section 3(21)(A)(ii) involving the rendering of investment advice for a fee. Rather, the question was whether the defendant bank, which was admittedly a named trustee for an ERISA plan, was a fiduciary with respect to employer stock held by the plan. The issue in that case, therefore, was the extent of the trustee's duty, not whether a trustee was a fiduciary at all. That case, and most others relied upon by defendant, are of little precedential value in the present case, as they did not deal with the special provisions of the statute and regulations concerning investment advice. Although it is certainly true that the possession of discretionary authority and control is generally the benchmark for fiduciary status under ERISA, it is also true that, in the special case of those providing investment advice, the existence of discretionary authority is not necessary to a finding of fiduciary status.

Two cases upon which defendant relies heavily deserve special scrutiny, because they did involve persons giving investment advice. The first case is the Seventh Circuit decision in *Wolin v. Smith Barney, Inc.*, 83 F.3d 847 (7th Cir. 1996). The *Wolin* case was exclusively concerned with the ERISA statute of limitations and the doctrine of equitable tolling. In introducing the subject, the court made the following statement in *dictum*:

-17-

> The statute, 29 U.S.C. § 1002(21)(A)(ii), as glossed by the Department of Labor's regulations, 29 C.F.R. § 2510.3-21, and by the cases, such as *Farm King Supply [ v. Edward D. Jones & Co.*, 884 F.2d 288 (7th Cir. 1989)] and *Thomas, Head & Greisen Employees Trust v. Buster*, 24 F.3d 1114, 1117-20 (9th Cir. 1994), requires that the investment advisor, in order to be deemed a fiduciary, with all that status implies, be rendering advice pursuant to an agreement, be paid for the advice, and *have influence approaching control over the plan's investment decisions.*

83 F.3d at 849 (emphasis added).  Defendant lays great emphasis upon the italicized *dictum*.  One searches in vain through the text of the statute and regulation and the two cases cited by the Seventh Circuit for any indication that an investment advisor "have influence approaching control over the plan's investment decisions" as a necessary prerequisite to a finding of fiduciary status.  Consequently, this statement by the court, in addition to being pure *dictum*, is not supported by any of the sources upon which the court relies.  Although the *Wolin* case is instructive on the question of the ERISA statute of limitations, the case cannot be deemed authoritative with regard to the court's unfortunate offhand and inaccurate remark concerning fiduciary status under ERISA.

The other case upon which defendant relies heavily is *Farm King Supply, Inc. v. Edward D. Jones & Co.*, 884 F.2d 288 (7th Cir. 1989), in which defendant was itself successful in persuading the trial court and Seventh Circuit Court of Appeals that it was not an ERISA fiduciary on the facts of the case.  The *Farm King* court did not purport to apply any test other than that which is set forth in the statute and the regulations quoted above.  The court examined each of the alternative ways under the regulation which a person rendering investment advice may be deemed a fiduciary.  The court first analyzed the question whether Edward Jones exercised discretionary authority or control, within the meaning of 29 C.F.R. § 2510.3-21(c)(1)(ii)(A) because of the plan's history of purchasing securities nearly exclusively from Jones over a four-year period.  The court found this pattern of purchases did not approach the exercise of discretionary authority or control

by the stockbroker.  884 F.2d at 292-93.  The court then turned to the alternative test, pursuant to which Jones could be deemed a fiduciary if it rendered individualized investment advice based on the particular needs of the plan.  *Id.* at 293.  In analyzing this issue, the court did not state or imply that a finding of discretionary authority or control was necessary.  Rather, the issue turned completely upon the trial court's finding of fact that no agreement or understanding existed between the parties pursuant to which the investment advice of Edward Jones would serve as a primary basis for investment decisions by the plan.  *Id.*  Examining the facts of the case, the court could not find a basis for overturning, as clearly erroneous, the factual determination of the trial court reached after a bench trial.  Among other things, the Seventh Circuit observed that the trustees had "never even provided Jones with its investment portfolio," so "Jones could not provide 'individualized investment advice to the Plan based on the particular needs of the Plan' without knowing the composition of the Plan's portfolio."  *Id.* at 294.  The appellate court therefore affirmed the trial court's finding against plaintiff, because plaintiff had failed in its burden of establishing the existence of an arrangement or agreement contemplating individualized advice, which is a necessary element under alternative B of the regulation.  The *Farm King* case, however, does not remotely stand for the proposition that a stockbroker cannot be an ERISA fiduciary, or that the broker's influence over the investment of plan assets must somehow approach discretionary control.

Properly read, *Farm King* stands for the unremarkable proposition that the federal courts will apply the Department of Labor regulation in determining fiduciary status, and that each element set forth in the regulation must be satisfied before the court finds fiduciary status to exist. Plaintiff's principal case, *Thomas, Head & Greisen Employees Trust v. Buster*, 24 F.3d 1114, 1118-1120 (9th Cir. 1994), stands for essentially the same proposition.  Although cases like *Farm King*

-19-

*Supply* and *Thomas, Head* are instructive in demonstrating how the statute and regulation should be applied to particular facts, neither case purports to establish its own test for fiduciary status or to deviate in any way from the elements set forth in the statute and regulation.

    2.  Application of Definition

  Plaintiff contends that Edward Jones meets the statutory definition of fiduciary under section 3(21) of ERISA in two ways. First, plaintiff contends that Edward Jones possessed discretionary authority or control respecting the management or disposition of plan assets, sufficient to satisfy section 3(21)(A)(i). Alternatively, plaintiff asserts that Edward Jones rendered investment advice within the meaning of section 3(21)(A)(ii) and the applicable regulation.

  Plaintiff's contention that Edward Jones possessed discretionary authority or control respecting plan assets is premised on the termination of check-writing privileges by Edward Jones in September 2004, when the prohibited transactions came to light. When asked to explain the firm's authority in this regard, the Rule 30(b)(6) deponent for Edward Jones explained that the firm has the ability to deny check-writing authority to anyone and to control access to its accounts. (Rule 30(b)(6) Dep., 207-09, Plf. Ex. 1). After this action, Retsema could no longer write checks, but he was able to access the account by contacting Edward Jones in writing. (*Id.*, 209). On the basis of this suspension of Retsema's check-writing privileges, plaintiff argues that Edward Jones had sufficient control throughout the twenty-year history of the account to be deemed a fiduciary under ERISA.

  Plaintiff's argument in this regard is not meritorious. If accepted, plaintiff's argument would include within the definition of fiduciary for ERISA purposes banks and all other depositories,

who merely hold plan assets. The federal courts hold that, without more, an entity's status as depository is insufficient to meet the definition of an ERISA fiduciary. *See Briscoe v. Fine*, 444 F.3d 478, 494 (6th Cir. 2006) (entities are not ERISA fiduciaries when they do no more than receive deposits from the plan from which the fund can draw checks); *Srein v. Frankford Trust Co.*, 323 F.3d 214, 222 (3d Cir. 2003); *Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 20 (1st Cir. 1998); *Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir. 1982). The mere fact that a depository temporarily suspends check-writing privileges (but not other means of access to the funds in an account) does not change this result. Significantly, plaintiff cites no authority to support its argument in this regard.

Plaintiff's second argument is much more substantial. Plaintiff asserts that Edward Jones rendered investment advice for a fee or other compensation within the meaning of section 3(21)(A)(ii) of ERISA and the implementing regulation, 29 C.F.R. § 2510.3-21(c). As noted in the previous section, neither the statute nor the regulation requires that a stockbroker exercise or possess discretionary authority or control to be deemed a fiduciary under these provisions. The law, as implemented by the regulation, requires only that the stockbroker (1) render investment advice to the plan on a regular basis (2) pursuant to a mutual agreement, arrangement, or understanding, written or otherwise between the broker and a plan fiduciary (3) that such services will serve as a primary basis for investment decisions with respect to plan assets, and (4) that the broker will render "individualized investment advice" to the plan based on the particular needs of the plan. The facts of this case demonstrate that Edward Jones met the regulation's definition throughout the twenty-year relationship between Edward Jones and the plan.

-21-

The facts set forth in paragraphs 6 through 9 of the Statement of Facts establish each of the required elements under the regulation. Those facts will not be reiterated at length here, but several points bear emphasis. First, Edward Jones does not seriously deny that Mr. Baetens rendered investment advice to the plan throughout its twenty-year history. It was Baetens who first recommended that the plan invest in Putnam Funds. (Retsema Dep., 13). Thereafter, Retsema and Baetens met on a regular basis to review the plan's investments and to "rebalance the portfolio." (Baetens Dep., 47, 48). The first requirement of the regulation is therefore amply met. Second, the record clearly establishes a mutual understanding that the services of Edward Jones would serve as "a primary basis for investment decisions." *See* 29 U.S.C. § 2510.3-21(c)(1)(ii)(B). Significantly, the regulation does not require that a stockbroker's advice be "the" primary basis for investment decisions. Nevertheless, the undisputed facts in the present case show that Edward Jones was the *only* source of investment advice for most of the plan's twenty-year history. Defendant itself acknowledges that Retsema never failed to accept a recommendation from Edward Jones concerning a plan investment. Defendant's attempt to characterize this twenty-year history as a series of sales pitches, followed by the trustee's decision to accept or reject the security being touted by the salesman, is unsupported by the record and could not be accepted by any rational trier of fact. The trustee gave Edward Jones regular access to information regarding the plan's portfolio so that Baetens could tailor his advice to the needs of the plan. This fact, among others, serves to distinguish this case from *Farm King Supply*, where the plan trustees "never even supplied Jones with its investment portfolio." 884 F.2d at 294. No reasonable trier of fact viewing the present record could fail to conclude that Edward Jones and the ERISA plan had a longstanding mutual

arrangement pursuant to which the investment advice of Edward Jones would serve as a primary basis for investment decisions.

Edward Jones clearly rendered "individualized investment advice" regarding investment policies or strategy, overall portfolio composition, and diversification of plan investments. The testimony of Baetens himself establishes this fact beyond genuine issue:

> And periodically we would rebalance the portfolio. For instance, based on the economic times where there would be, particularly in the late '80s when we had a big run up in the stock market, it made sense to reallocate some of the assets into the bond market. So some of the trades may be going from Putnam stock fund to Putnam bond fund or Putnam bond fund to Putnam stock funds, so that was more of a rebalancing situation. And obviously a lot of activity was going on in that particular time. So there were several trades done.

(Baetens Dep., 47-48). Defendant nevertheless argues that the advice was not "individualized," because it was based on general guidelines for retirement funds that Edward Jones formulated through its investment policy committee. In making this argument, defendant distorts the term "individualized" beyond all recognition. To be "individualized" within the meaning of the regulation, advice must pertain to investment policies or strategy or portfolio composition or diversification. 29 C.F.R. § 2510.3-21(c)(1)(ii)(B). In other words, the advice must address the individual needs of the plan. To be "individualized," the advice need not be arbitrary or divorced from general principles of investment generated by a firm. Edward Jones apparently contends that advice grounded in some set of general principles cannot be individualized, such that only fanciful or random advice would satisfy the regulation. Edward Jones cites no authority for this strained reading of the regulation.[2]

_____

[2] Obviously, the writers of the regulation were attempting to differentiate individualized investment advice, which is based upon the particular needs of the plan, from the general promotion of a product or service, pursuant to which a stockbroker might "recommend" a security to its customers at large. To be sure, the line between sales activity on the one hand and advice on the

Finally, it is clear that Edward Jones received a fee or other compensation, direct or indirect, for its investment advice within the meaning of section 3(21)(A)(ii) of ERISA.  As recited in the Statement of Facts, Edward Jones received a commission at the time each security was purchased, as well as a number of other fees during the life of the relationship.  Jones characterizes these fees as commissions for sales, not a fee for investment advice; the advice, says Jones, was "free."  This argument is untenable in light of the language of the statute, which requires only a "fee or other compensation, direct or indirect," in exchange for investment advice.  *See Thomas, Head*, 24 F.3d at 1120 (profit realized by securities salesman constituted fee or other compensation within the meaning of ERISA).

In summary, the evidence supporting a finding of fiduciary status under 29 U.S.C. § 2510.3-21(c)(1)(ii)(B) is so one-sided that no rational trier of fact could conclude otherwise.  Given this finding, the "stockbroker exemption" created in subsection (d) of the same regulation is irrelevant, as Edward Jones did not "solely" execute transactions for the purchase and sale of securities.  Rather, Edward Jones rendered investment advice and did not merely execute trades.  The court will therefore enter summary judgment on behalf of plaintiff on this issue.

### B.    Breach of Fiduciary Duty

Plaintiff contends that Edward Jones is liable for direct breach of its fiduciary duties and for its allegedly active participation in the unauthorized loans made by Retsema to his company.  Alternatively, plaintiff asserts that Edward Jones is liable under the section of ERISA imposing co-

---

other may be indistinct in some circumstances.  In the present case, however, the record clearly establishes that Baetens was advising the plan and not merely subjecting it to generalized sales efforts.

fiduciary liability, section 405(a).  Both parties have moved for summary judgment on the issue of breach of fiduciary duty.  For the reasons set forth below, the court finds that defendant is entitled to a judgment in its favor on all claims of active participation, but not on certain claims of direct breach of duty or the claim of co-fiduciary liability.

The court's finding that Edward Jones was a fiduciary within the meaning of ERISA does not make Jones automatically liable for all losses to the plan.  The language of section 3(21)(A) of ERISA itself provides that a person is a fiduciary with respect to a plan "to the extent" that the person exercises one of the three functions set forth in the statute.  On the basis of this language, the federal courts unanimously hold that fiduciary status under ERISA is not "an all or nothing proposition."  *See Brisco v. Fine*, 444 F.3d 478, 486 (6th Cir. 2006).  The court must therefore examine the conduct at issue to determine whether a defendant had a duty to exercise fiduciary responsibility.  *Id.*

Plaintiff's theories of ERISA liability are set forth in paragraph 36 of the amended complaint.  Some claims are for direct breaches of fiduciary duty.  Edward Jones was a fiduciary in the circumstances of this case because it rendered investment advice within the meaning of section 3(21)(A)(ii) of ERISA, not because it had discretion over administration of the plan or control of its assets.  Defendant's direct fiduciary duties, therefore, were limited to the provision of investment advice.  Plaintiff cogently argues that a reasonably prudent investment advisor, acting within the scope of this narrow duty, had an obligation to at least investigate where all plan funds were invested.  Plaintiff argues that defendant could not give accurate advice on diversification of the plan's investments unless it knew where all of the plan's money was.  Plaintiff points to the plan's annual reports, which showed yearly increases in the plan's "cash" investments, driven principally

by larger and larger "Employer Receivables."  (*See* Plf. Ex. 9).  In order to execute its obligations

to advise the trustee concerning the balancing and diversification of plan assets, it is at least arguable

that Edward Jones had some duty of inquiring into the nature of the large and increasing "cash"

investments disclosed in the annual reports.

On this basis, two theories of direct liability in the amended complaint are viable.

Paragraph 36(G) alleges a violation of the basic fiduciary duty to act in accordance with the prudent

person standard of 29 U.S.C. § 1104(a)(1)(B).  This duty extends only to those matters falling within

the scope of a person's fiduciary undertaking.  Even viewing the scope of defendant's duty as

extending only to the narrow issues of plan investment and diversification, a rational trier of fact

could conclude that a reasonably prudent person should have inquired into the nature of the cash

investments, if only to reach a sound conclusion on the need for diversification of other investments.

Similarly, paragraph 36(K) alleges that defendant's breach of duty enabled Retsema to commit the

prohibited transactions.  *See* 29 U.S.C. § 1105(a)(2).  Again, a reasonable factfinder could conclude

that at some point, the prudent exercise of defendant's role as investment advisor should have led

to an inquiry, and that future losses at least might have thereby been averted.  Other allegations of

direct liability are not meritorious.  Paragraph 36(D) alleges that defendant failed to diversify plan

assets to minimize risk as required by 29 U.S.C. § 1104(a)(1)(C).  Defendant's obligation, however,

was to give investment advice; it had no control of the assets themselves.  The same can be said of

paragraph 36(A), which alleges that defendant failed to act for the exclusive benefit of the plan

participants.  29 U.S.C. § 1104(a)(1)(A).

Other allegations of ERISA liability depend upon a finding that defendant actively

participated in Retsema's prohibited transactions.  (*See* Amended Compl., ¶¶ 36(B) (self-dealing);

-26-

36(E) (providing misleading reports to participants, the IRS, and the DOL); 36(F) (allowing plan assets to issue to benefit of employer, 36(H) (loans to party-in-interest); 36(I) (transfer of plan assets to party-in-interest)).  To be responsible for these prohibited transactions, defendant must have caused them.  ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1).  "But in order to sustain an alleged transgression of § 406(a), a plaintiff must show that a fiduciary caused the plan to engage in the allegedly unlawful transaction.  Unless a plaintiff can make that showing, there can be no violation of § 406(a)(1) to warrant relief under the enforcement provisions."  *Lockheed Corp. v. Spink*, 517 U.S. 882, 888-89 (1996).  No evidence supports such a finding.  Plaintiff nevertheless asserts that defendant participated in Retsema's wrongdoing, because Retsema made the prohibited loans by drawing checks from the money market account held by Edward Jones.  Mere custody of plan assets, however, is insufficient to create liability.  *See Briscoe*, 444 F.3d at 494.  Plaintiff has presented no proof that Edward Jones "caused" the prohibited transactions or that it actively aided and abetted Retsema in doing so.  Plaintiff's theory of active participation, based almost completely on a depository's routine processing of checks in circumstances that were, at most, arguably suspicious, is unsupported by any authority imposing liability in even remotely analogous circumstances.  It is indisputable that Retsema committed active wrongdoing.  Defendant's liability, if any, arises from its failure to act.

Defendant is therefore entitled to a summary judgment on all theories of active violations of ERISA, except those in paragraphs 36(G) and (K) of the amended complaint.  The remaining theories either presume that the prohibited transactions themselves fell within the scope of defendant's fiduciary undertaking (which plaintiff has failed to prove) or that defendant actively caused the prohibited transactions (which plaintiff has likewise failed to support with proof).

In addition to liability for losses caused directly by a fiduciary, ERISA imposes liability for breaches of duty by co-fiduciaries, in certain limited circumstances.  The statutory section imposing co-fiduciary liability is section 405 of ERISA, 29 U.S.C. § 1105, which provides in pertinent part as follows:

**(a)     Circumstances giving rise to liability**
In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

**(1)**     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.

\* \* \* \*

**(3)**     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

ERISA § 405, 29 U.S.C. § 1105(a).  In paragraph 36(J) of the amended complaint, plaintiff has alleged liability under section 405(a)(1), but has provided no direct or circumstantial evidence that Edward Jones participated knowingly in Retsema's unlawful conduct or attempted to conceal it.  Liability under section 405(a)(1) therefore does not exist on the present record.  Plaintiff further alleges, however, that liability arises under section 405(a)(3), which requires a showing that a co-fiduciary had knowledge of a breach by another fiduciary and failed to make reasonable efforts under the circumstances to remedy the breach.  (Amended Compl., ¶ 36(L)).

Section 405(a)(3), on its face, requires actual knowledge of a breach by a co-fiduciary as a prerequisite to liability.  This statutory language contrasts with other provisions of ERISA, in which Congress established a lower standard of *scienter* -- "knows or should know."  *See, e.g.,* 29

U.S.C. § 1106(a)(1).  Given the clarity of the statutory language in section 405, the courts hold that actual knowledge is required and that constructive knowledge will not do.  *See, e.g., Silverman v. Mutual Benefit Life Ins.*, 138 F.3d 98, 104 (2d Cir. 1998); *Lee v. Burkhart*, 991 F.2d 1004, 1010 (2d Cir. 1993); *Donovan v. Cunningham*, 716 F.2d 1445, 1475 (5th Cir. 1983); *Davidson v. Cook*, 567 F. Supp. 225, 237 (E.D. Va. 1983).  Of course, a factfinder is allowed to infer actual knowledge on the basis of circumstantial evidence.  *See Silverman*, 138 F.3d at 104-05.

Plaintiff's principal argument in this regard is based upon circumstantial evidence. Plaintiff asserts that, at a minimum, there was ample evidence to create "suspicion on the part of Baetens."  (Brief, docket # 132, at 10).  Plaintiff argues that the plan's writing of large checks to Rycenga Homes should have set off "alarm bells" and that the documents received by Edward Jones, including annual reports, showed suspicious receivables from the employer to the plan.  A reasonable trier of fact *could* rely on this and other evidence to conclude that, at some point, Edward Jones had actual knowledge of Retsema's wrongdoing, but that conclusion is by no means inevitable.  The circumstantial evidence is not so strong that a reasonable trier of fact could come but to a single conclusion on this issue.

The only direct evidence of knowledge by Edward Jones arises from the Kaplan letter, sent as a cover letter for the 2001 annual report, in which Mr. Kaplan advised Retsema that the loans were prohibited transactions under ERISA and could be criminal offenses.  Even though this letter was produced from the files of Edward Jones, Mr. Baetens denied having seen it at the time and proffered reasons why the letter may have escaped his notice, even if received.  A trier of fact may or may not choose to credit Mr. Baetens's explanations, once the trier of fact is able to gauge his credibility.  If his explanations are accepted, the trier of fact may conclude that Edward Jones lacked

-29-

actual knowledge, even after the Kaplan letter was sent.  On a motion for summary judgment, the court is not able to make credibility determinations or to discount explanations made under oath.

For the foregoing reasons, the court determines that the liability of Edward Jones under the provisions of section 405(a)(3) of ERISA raises genuine issues of material fact that cannot be resolved on a motion for summary judgment.  The cross-motions will therefore be denied with regard to this issue.

C.      **Statute of Limitations**

Defendant seeks a summary judgment precluding recovery for any losses predating October 18, 1998, the date six years before the filing of this suit.  Defendant bases this request on the ERISA statute of limitations, which establishes a three-year and a six-year limitation period.  The text of the ERISA statute of limitations is set forth below:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of --
>
> **(1)**      six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
>
> **(2)**      three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

ERISA § 413, 29 U.S.C. § 1113.  As the party asserting the affirmative defense of the statute of limitations, defendant has the burden of demonstrating that the statute has run.  *See Griffin v. Rogers*, 308 F.3d 647, 653 (6th Cir. 2002).  This burden requires the party asserting the defense to introduce

-30-

substantial evidence to demonstrate that the events triggering the running of the statute have occurred. *Id.*; *see Campbell v. Grand Trunk Western RR Co.*, 238 F.3d 772, 775 (6th Cir. 2001).

One distinguished court has described ERISA's limitation period for breach of fiduciary duty as being "held together by chewing gum and baling wire." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 188 (2d Cir. 2001). The limitation period for affirmative acts is rather clear: it begins to run on the date of the last action which constituted a part of the breach or violation. 29 U.S.C. § 1113(1)(A). The beginning date for the statutory period regarding omissions is harder to pin down, because it is measured not by the date of the omission, but by the "latest date on which the fiduciary could have cured the breach." For this reason, many plaintiffs attempt to strategically recharacterize their claim from one of affirmative act to one of omission. The courts generally resist such efforts. *See, e.g., Radiology Center S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216, 1221 (7th Cir. 1990). Defendant accuses plaintiff of engaging in such subterfuge, pointing to the allegations in the complaint to the effect that Edward Jones actively participated in Retsema's wrongdoing. If the court had found any evidence to support a claim of active participation, the six-year period would indeed run from the date of such affirmative acts. The court has, however, found no support for a claim against Edward Jones of active participation in Retsema's conduct. Consequently, the only remaining claims are (1) breach of fiduciary duty in failing to inquire concerning the plan's large and growing cash investments and (2) co-fiduciary liability under section 405(a)(3), which requires plaintiff to show as a prerequisite to recovery that defendant had knowledge of a breach by another fiduciary, failed to make reasonable efforts under the circumstances to remedy the breach, and that the plan's loss resulted from that failure. *See Silverman*, 138 F.3d at 104. These claims are clearly based on omissions, that is, a failure to act. No impermissible recharacterization is involved.

When viewed as a case of omission under section 413(1)(B) of ERISA, resolution of defendant's statute of limitations defense becomes highly fact-specific.  In some cases, the last date upon which a fiduciary could have cured a violation is obvious.  For example, a trustee can no longer act after the time it ceases to be a fiduciary.  *See, e.g., Aull v. Cavalcade Pension Plan*, 988 F. Supp. 1360 (D. Colo. 1997).  No such bright line exists in the present case.  Edward Jones served the trust from its inception to nearly the end of 2004.  Under the wording of the statute, the critical date is not the date of the prohibited transaction; it is not even the date when Edward Jones knew about it, nor the date on which injury was caused.  Rather, defendant has the burden of proving the latest date upon which Edward Jones could have cured the violation.  With regard to past violations, proving this date would entail an inquiry into the solvency of Rycenga Homes: if the employer had sufficient assets, the breach could have been cured by recovery from the employer at that time.  If the employer were insolvent by then, however, the breach presumably could not have been cured.  With regard to future events, the question turns on the date upon which Edward Jones knew of the prohibited transactions.  Presumably, reporting at that point would have prevented loss from future loans.  As the date upon which Edward Jones "knew" of the prohibited transactions (if indeed it did know) presents an unresolved question of fact, the court cannot determine with any certainty the date upon which defendant's alleged omissions were subject to cure.[3]

---

[3] Plaintiff also invokes the six-year discovery rule for fraud or concealment.  The majority of appellate courts interpret this provision as requiring pleading and proof of fraudulent concealment, that is, action taken to conceal wrongdoing apart from the original breach of duty.  *See, e.g., In re Unisys Corp. Retiree Med. Ben. ERISA Lit.*, 242 F.3d 497, 502 (3d Cir. 2001); *Wolin v. Smith Barney, Inc.*, 83 F.3d 847, 851-53 (7th Cir. 1996).  There is no evidence in the present case of fraudulent concealment by Edward Jones.  At least one circuit goes further, applying the six-year statute to underlying claims sounding in fraud, in addition to acts designed to hinder discovery.  *Caputo*, 267 F.3d at 190.  Again, plaintiff has neither pleaded nor proven an underlying claim of fraud by Edward Jones.

The existence of unresolved questions of fact renders it impossible to grant a summary judgment for defendant on the ground of the statute of limitations. Defendant's motion will therefore be denied in this regard.

**D.      Count II**

Count II of the complaint presents an alternative claim, premised on the allegation that Edward Jones was not a plan fiduciary. Count II alleges that, as a nonfiduciary, Edward Jones breached its common-law duty to insist that the fiduciary disclose its breaches. Plaintiff premises this claim on dictum in a Ninth Circuit case that seems to at least assume the existence of such a duty. *CSA 401K Plan v. Pension Professionals, Inc.*, 195 F.3d 1135, 1141 (9th Cir. 1999). Because the court has now found that Edward Jones was a fiduciary as a matter of law, count II is no longer viable. Edward Jones was a fiduciary during all times relevant to plaintiff's claims. Common-law claims against an ERISA fiduciary are clearly preempted by § 514 of ERISA, 29 U.S.C. § 1144. *See Briscoe*, 444 F.3d at 497-500; *Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir. 1999).

<u>**Conclusion**</u>

For the foregoing reasons, plaintiff's motion for partial summary judgment (docket # 127) will be granted to the extent that it seeks a finding that defendant Edward D. Jones & Co. was a plan fiduciary for purposes of ERISA. The motion will be denied in all other respects. Defendant's motion for summary judgment (docket # 125) will be granted in part and denied in part, as follows:

(1)      Count I -- defendant is granted judgment dismissing all claims of

direct liability under ERISA, except for the claims set forth in paragraphs 36(G) and

-33-

(K) of the First Amended Complaint; defendant's motion for judgment on the claim in paragraph 36(L) for co-fiduciary liability is denied, as is its motion based on the statute of limitations.

(2)    Defendant is granted judgment on count II on the ground of preemption.

This case will proceed to trial on all remaining issues.  The parties are directed to file briefs within 14 days hereof directed to the question whether any remaining issue is triable to a jury.


Dated:  March 15, 2007                              /s/  Joseph G. Scoville
                                                    United States Magistrate Judge

-34-